All right. Mr. Pettigrew, you may proceed when you're ready. Thank you, Your Honor. Joseph Pettigrew for the shareholders and plaintiffs' appellants in the case. I'd like to start with a broad proposition and then very quickly narrow things down if you'll allow me. The broad proposition would be that corporate law of this country and Delaware in particular grants a great deal of latitude to directors of corporations in running the business of those corporations. Generally speaking, the decisions that those directors make are theirs to make and cannot be challenged by shareholders of the company. However, that liberty is not absolute. There are cases where directors are not allowed to rest on their own decisions. In particular, they owe fiduciary duties to the company and its shareholders not to cause the company to act in an illegal fashion or to breach their own fiduciary duties. In this case, the shareholders of Centene, plaintiffs in this case, did rely on the representations of the directors and the company in and around the merger of Centene with Health Net, two insurance companies, both of which rely heavily on calculations of loss preserves as far as what makes those companies profitable. In this case, there were two moments where the directors allowed the company to present to the public, to the shareholders, false and misleading statements. First, we have the merger proxy, which was designed to solicit votes to approve the merger itself. Secondly, we have an SEC Form 10-Q, the first report after the merger had closed. In both cases, the directors were aware of major problems at Health Net that they failed to disclose to the public or allowed those disclosures to go through. As far as the proxy is concerned, the directors were informed that there was a very high opt-out rate of a certain program at Health Net. While that was disclosed in a side filing by Health Net, a previous filing, it was nowhere disclosed that the opt-out rate was so high as to put the program itself at risk. As one of the main rationales for the merger was the strength of Health Net's California business in particular, and in fact, the proxy stated that the merger would maintain and enhance the California business. By not revealing or fully disclosing the extent to which that opt-out rate was an issue caused that statement to be misleading. In addition, prior to the proxy vote, the directors completely failed to cause the company to engage in any kind of due diligence as far as looking into the loss reserves of Health Net. They had actuaries available, they had their own company, which they used for their own loss reserve calculations, but they completely failed to do so. Any information that they did put out in the public would be based on that failure. So what duty is that a breach of, counsel? Pardon me, could you repeat that please, your honor? What's the substantive violation there? Is there a breach of a duty you just described or a particular regulation that you're tying that to? Yeah, so there are two violations. There is a breach of fiduciary duty on the part of the We are talking about the duty of candor as well as the duty of loyalty. And we're also talking about a violation of Section 14a of the Securities Act, which prohibits false and misleading statements in proxies such as the one at issue here. And because of the inability of the directors to discharge their duties, plaintiffs, shareholders did not have the full information that they needed to approve this deal with all of the knowledge that they should have had. And again, the directors themselves did have this knowledge and they the SEC. By that point, the directors had a great deal of information about the problems of Health Net. They had been informed that the revenues of Health Net were hundreds of million dollars off what was previously represented. They knew that the California and Arizona programs were in dire straits. And in fact, that the Arizona program was going to be canceled. And most significantly, the day before the board met on the day of the release of that 10Q, the audit committee met and they were presented with information that the amount of reserves that Health Net should have reported were understated by, at that point, 117 million dollars. And so those directors knew that this was a major liability that would affect the bottom line, not only of legacy Health Net, but also Santine. And the next day at the board of directors meeting, we received a business report, which was presented by the CFO of Santine, as well as the chair of the audit committee were both present and part of that presentation. And we allege that at that board of directors meeting, that that information or the impact of that increase of lost reserves was communicated to the board as a whole. And as a result, the board had that specific knowledge as well, knowing that the financial results that they were going to be presenting to the market that day, to the two shareholders, once again, of the company that day, were false and misleading. I may be misunderstanding Delaware law here, but don't you have to plead specifically that the acts that you're challenging were not the valid exercise of business judgment? I mean, is that the claim here under the Aronson test? And I may be mispronouncing that case, but I guess I'm losing a bit of a law here. I understand your factual allegations, but what is it you have to prove? What is it you have to plead? And as I understand it, you have to show a majority of the directors are not disinterested or that this was not a valid exercise of business judgment. Am I misreading the law there? No, that's an accurate statement of the law, your honor. And in this case, because the directors permitted, with knowledge, the dissemination of these false and misleading statements, that is a violation of the law. And companies, while they are allowed to make, or while directors are allowed to use their business judgment, allowing a company to pursue profits with unlawful activity is not permitted. So by virtue of these releases that violated securities laws, then that removes it from the business judgment standard. And in fact, all that we have to show, as plaintiffs in this case, is it's a threshold showing this is just a motion to dismiss. And we need to show an inference of knowledge that the corporation was accused of imprudent or unlawful conduct. So on the 14A claim, did you plead anything that suggests the directors knew about HNT's loss when the proxy was issued? We allege that at the time that the proxy issued, that they were aware that this crucial California program was at risk due to the high opt-out rate. I mean, what are the specifics in the pleadings on that issue? We allege that throughout the complaint. I believe if you go to paragraphs 98 through 100 of the complaint, that that is where we describe the, I'm sorry, that's where we describe the knowledge surrounding the TANQ. But we did... Yeah, about the proxy? Yeah, so with the proxy, we allege that, for example, on our appendix, page 62, we allege that the proxy did not disclose the risks or trends known to the defendants related to Health Net's poorly designed policies, their failing Arizona business, and refusal to pay other... But don't you have to plead knowledge? Yes, yes. I mean, so you just make a facial assertion that they knew it? Is that sufficient? No, Your Honor, we allege that at specific board meetings discussing these issues, that the directors were informed about the high opt-out rate and the potential impact of that. We also allege that the directors failed to conduct a due diligence into the loss reserves of Health Net, that, if known, would have changed the valuation of the company and ultimately would have, you know, would have altered the total mix of information. Okay, all right. Thank you. Counsel, before your time expires, I wanted to see if you could clear up a matter that maybe will simplify what we have to look at here. But, and so my question is this, in this appeal, have you or did you make the decision to abandon some of the theories or some of the causes of action? I'm thinking about the fiduciary duty claims, insider trading, and unjust enrichment. Yes, Your Honor. I see a lot in the briefing about the 14A, but these others seem, and I'm just wondering if there had been a decision made to focus on the 14A and let the others go. Thank you, Your Honor. No, we have not waived any claims. We have not waived any arguments, as we make clear in our papers. We allege violations of 14A. We allege fiduciary duty breaches based on putting out false and misleading statements, the 14A and the 10Q, as well as the duty of loyalty. As far as the insider trading, that is still an active claim. We state that demand would be futile as to that claim because the other directors would be forced to basically investigate themselves because the claims are based on the same facts. So we do allege both the insider trading as well as the unjust enrichment. And also, just to provide a little more context and a framework for the court, we have looked carefully at this court's previous decision in Cattrell v. Duke, the Walmart bribery case, and we believe that our complaint, again, this is just at the motion to dismiss stage, but that our complaint alleges what Cattrell asked for. We allege a specific interaction at which the wrongdoing, the information, could and should have been reported. Those would be the board meetings about the proxy, as well as the board meeting about the 10Q. And we have alleged, again, quoting from Cattrell, the sort of concrete facts that Delaware law requires to substantiate enough of the details. We believe that we have more than adequately alleged the facts that are needed to sustain the complaint and that this by far exceeds the standards set forth in Cattrell. And I'll pause here. All right. Thank you, counsel. Mr. Voretsky. Good afternoon, your honors. I may have pleased the court. I'm Shai Voretsky with Skadden Arps on behalf of the appellees. Let me start out with the question that Judge Kobus asked about what the legal standard is. And I agree with what Mr. Pettigrew acknowledged at the outset of his argument, that a decision to bring a lawsuit on behalf of a corporation falls within the province of its board of directors. And that's not something to be second-guessed lightly. And that's why, as a matter of both the federal rules of civil procedure and Delaware law, when a plaintiff seeks to bypass the board and bypass making the demand, that's a serious departure from the ordinary norms of corporate governance. And it requires a compelling justification. It's supposed to be difficult for a plaintiff to take away the board's rights to control the company's claim. And so, as then Judge Kavanaugh said in a case involving Delaware law, the bar is high, the standards are stringent, and the situations where demand will be excused are rare. This is not just a matter of skating by on a 12B6. You need to show that the board was disloyal. It's going to be a very rare case where there's director misconduct so egregious and pled with such particularity that the plaintiffs have shown that a substantial likelihood of director liability exists. What that means in a case like this is that you need to go claim by claim and the plaintiffs need to plead particularized and egregious facts. And you need to show that a majority of the board faces a substantial likelihood. They haven't done that here. And nor have they articulated any theory of why this board would have done such a thing. The board had no incentive to profit personally or no incentive to cram this merger down the shareholders' throats in any way. Rather, this was a perfectly ordinary transaction. The board considered it and thought that it had the potential to create tremendous value for shareholders. It conducted normal, thorough due diligence. It relied on the management and the company's advisors when it was approving the transaction, as is typical for any board. It issued a several hundred page detailed proxy with robust risk disclosures that the shareholders approved by over a 99 percent vote. And the transaction proved to be a tremendous success. In just the 27 months following the time that the merger closed, Centene's stock price doubled. Now, over time, the company uncovered a few minor issues about HealthNet that constituted less than 5 percent of what was a multi-billion dollar, 6.8 billion dollar purchase price. None of that is abnormal in an arm's length transaction of this size. And at the end of the day, the board's vision in this case came true because the transaction produced tremendous value for the company and its shareholders. To find demand futility for a transaction like this would dramatically rewrite and expand corporate law under both this circuit's law and Delaware law. And would mean that demand futility could be established in virtually every ordinary transaction. Now, to look at three of the specific points that Mr. Pettigrew made. Let me interrupt you briefly and go back to the question I asked at the end of counsel's argument. Are there some claims here that have been dropped by, and I say dropped, are not pursued on appeal because they were not briefed or have been more overtly waived? So, I think there are a number of claims that have been waived here. First of all, when we look at the fiduciary duty claims, there have been shifting theories of what the fiduciary duty violation is. The fiduciary duty violation that I principally heard Mr. Pettigrew articulate today was that in the 10Q that was issued in April of 2016, the 10Q did not call out, in particular, the $110 million dollar reserve that had been taken. That theory was advanced on appeal, but was not presented to the district court. So, it was waived in that sense. The other fiduciary breach theories, including that the board's due diligence was insufficient as a matter of law, that, I think, was presented to the district court, but not presented on appeal. And the other fiduciary duty theories have also not been developed on appeal. The Caremark claim that was raised in the district court was not pursued on appeal. The unjust enrichment claim, the plaintiffs have never really offered more than just a bare bones argument on that to begin with, and I think that that falls along with the fiduciary duty claims in any event. So, there's a lot going on. You're right here in terms of waiver. To address the arguments that Mr. Pettigrew made today, with respect to the proxy statement, he was particularly focused on the fact that Health Net had experienced some opt-out rates for particular programs in California. For starters, this was expressly disclosed in Health Net's 2014 10K. So, it was a matter of public record, and that disclosure was incorporated by reference into the proxy. And so, there was no misleading going on. Mr. Pettigrew, the plaintiffs cite no case suggesting that the board had to call particular attention to those opt-out rates beyond what had been publicly disclosed. Mr. Pettigrew argued this afternoon that the consequences of the opt-out rate were not apparent. That's not true either, because in the form 10K, it specifically said that if large numbers of dual eligibles continue to opt out of the program, Health Net's profitability with respect to the program may be lower than originally anticipated. So, all of that was disclosed. There was nothing false or misleading about not calling that out. Nor have the plaintiffs ever shown scienter with respect to not calling that out. Again, in order to prevail here, they would have to show that there was fraudulent intent, that the directors knowingly misled and hid something from the shareholders. That's not what happened factually, and there's simply no theory for why they even would have done that. With respect to the $117 million reserve in the 10Q, that amount was incorporated into the financial disclosures in the 10Q. The plaintiff's concern or allegation is that the directors had to specifically call out that line item and highlight the $110 million.  In fact, if you look at the beginning of their brief, in accordance with this court's rules, there's a section where you need to identify the opposite cases for a particular claim. They say there are no opposite cases. That in and of itself shows that their claims fall far short of the high burden under Delaware law for excusing a demand on the board. The third and I think final point that I heard Mr. Pettigrew focus on this afternoon was a purported failure of due diligence as a matter of breach of fiduciary duty. For starters, Centene's corporate charter exculpates director liability for any breach of the fiduciary duty of care. Any alleged breach of fiduciary duty has to be evaluated not under the duty of care, but under the duty of loyalty standard. That requires showing that the directors acted with bad faith. There is simply no credible argument here that the directors acted in bad faith in the way that they conducted due diligence. Due diligence is fundamentally a matter of the duty of care. Again, conduct for that is exculpated. There was nothing unusual about the due diligence that was conducted here. As a matter of law, this was sufficient due diligence. The board sought advice from two financial advisors, each of which said that the merger's terms were fair. It engaged McKinsey. It engaged KPMG. It engaged corporate counsel. It held multiple meetings to review the progress of the due diligence. This is sufficient as a matter of law and certainly falls far short of the standard for a breach of the duty of loyalty, showing that the board was disloyal and acted in bad faith. Again, I would just emphasize the extremely high bar that the plaintiffs need to clear here. It needs to be done claim by claim, analyzing each claim individually, and with particular allegations of what the board knew at the time that the proxy was issued with respect to the proxy statement and with allegations of scienter to show that the board acted knowingly and in bad faith. All of that has to be done as to each individual director. They would have to show that a majority of the directors face a substantial likelihood of liability. They simply haven't done that. They haven't articulated any theory for why the directors would have acted that way. This is an attempt to attack what ultimately turned out to be an extremely successful transaction for the company. Allowing that kind of an attack to proceed and to take control of that claim away from the company would vastly expand Delaware law. If the court has no further questions, we would rest on our brief and ask that the district court's judgment be affirmed. Thank you, counsel. At this time, does Mr. Pettigrew have remaining, Ms. McKee? I see you're out of time. Go ahead. We asked some questions, took up some of your time. Take two minutes, Mr. Pettigrew, and wrap up. Okay. I appreciate that, your honor. This was not a success. This deal was not a success. When the loss reserves, which was revealed to the directors in April, was finally revealed to the public three months later, there was a stock drop. There was a securities class action fraud suit that was brought. Ultimately, the company, as a direct result of this merger, was forced to record almost $400 million of further loss reserves and lost about $1 billion in market capitalization, which harms the reputation of the company as well as its ability to borrow on good terms. This was not a success. It took nearly a full year for the stock price to recover from the drop in July. So, ultimately, if this deal was a success, it was in spite of the defendants in view of their putting out, again, false and misleading statements. Companies are not allowed to pursue profits through illegal means. And shareholders should be able to trust their fiduciaries to put out full and meaningful disclosures. And that is not what happened as far as the proxy is concerned. And that's not what happened as far as the 10Q is concerned either. I'll wrap up there if there are no more questions. Okay. Thank you, Mr. Pettigrew. And thank you, counsel, for your arguments. The case is submitted. And the court will render